June Term,
1860.

HURD
v.
HALL.

## HURD VS. HALL.

In 1854 *A* and *B* made an entry, at the office of the commissioners of school and university lands, of lots 118, 120, 121 and 122, of a certain section No. 16 in

Rock county, and received certificates therefor, and also purchased from the holders two certificates issued by said commissioners in 1850, for lots 117 and 123, in the same section, and a certificate issued by said commissioners in 1853, for lot 116 in the same section. The certificates for lots 117 and 123 were valid; but all the other certificates were *void*, for the reason that the lots therein mentioned had been sold by said commissioners, in 1850, to other parties, and were again sold by them in 1853 and 1854, at private sale, on account of the non-payment of interest, without having first been offered for resale at public auction, as required by law. Shortly afterwards *A* purchased from *B* his interest in all said certificates, and took an assignment of such interest at the price of $30 per acre for one-half of the land, after deducting the amount due to the state, both parties supposing, at the time of such assignment, that all said certificates were valid, and *A*, although he knew that said lands had been sold by said commissioners in 1850, being ignorant whether said lands had been offered for resale at public auction or not: *Held*, that *A's* ignorance that said lands had not been offered for resale at public auction by said commissioners, was such a mistake or ignorance of *fact*, as gave him a right in equity to a rescision of the contract.

DIXON, C. J., was of opinion that *A* could maintain his action for a rescision of the contract, on the grounds, also, of an implied warranty in the assignment of said certificates, that the same were valid, and of a failure of consideration for the money paid, or agreed to be paid to *B*, in that the instruments assigned were not school land certificates, as they purported to be.

*Held, also*, that if, in the meantime, *A* had acquired a good title to all said lands, by buying the outstanding valid certificates, at a less price than he had agreed to pay *B* for the invalid ones, the proper measure of relief would be the deduction of one half the sum paid by *A* to perfect his title, from the amount of the purchase money agreed to be paid by him to *B*.

APPEAL from the circuit court for *Dane* county.

This was an action to recover back money paid by the plaintiff to the defendant, and for other relief. The complaint, as amended, alleges, that on the 2d day of October, 1854, the defendant applied to the commissioners of school and university lands of the state of Wisconsin, to purchase for himself and the plaintiff, jointly, lots Nos. 118, 120, 121 and 122 in section 16, town 4, range 12, in Rock county; that upon such application the commissioners executed certificates of sale for said lots to the plaintiff and defendant, in the usual form, they paying the part of the purchase money required to be paid in hand; that on the 6th of October, 1854, the plaintiff and defendant purchased of one *Perkins*, two certificates issued by said commissioners, bearing date July 12th, 1850, one for the sale of lot 123, and the other

VOL. XII—8

for lot 117, in section 16, above mentioned, and received from said *Perkins* an assignment of said certificates; that on the 11th of January, 1855, the plaintiff and defendant purchased of *A. Botkin* and *D. M. Seaver*, a certificate issued by said commissioners, dated August 15th, 1853, for lot No. 116, in said section 16, and received from said *Botkin* and *Seaver*, an assignment of said certificate; that on the 3d of June, 1856, the plaintiff and defendant entered into an agreement, whereby the plaintiff purchased of said defendant, his right, title and interest in the lots described in all said certificates, and agreed to pay him therefor, the sum of $2,154,50, being thirty dollars per acre, for one half of the number of acres of land, after deducting the amount of the purchase money due to the state; that the defendant executed and acknowledged an assignment, in writing, of each of said certificates, in the following words: "For, and in consideration of the sum of one hundred dollars, I hereby assign and transfer all my right and interest in the within certificate, to *Silas Hurd*, June 23d, 1856—W. T. HALL." and the plaintiff paid to the defendant, the sum of $654,50, and executed his three promissory notes for $500 each, one of which was payable on the 23d of June, 1857, bearing 12 per cent. interest, and the others were payable in two and three years after date. The complaint further alleges, that at the time the plaintiff and defendant purchased of the state said lots 118, 120, 121 and 122, they believed said lands were subject to entry, and that said commissioners had lawful authority to sell the same, and were ignorant that there was any outstanding claim to the land, held by any other person; that at the time they purchased said certificate for said lot 116 from said *Botkin* and *Seaver*, they believed that said certificate was valid, and were entirely ignorant of the fact, that there was any outstanding claim to said lot, prior or paramount to the right created by said certificate; and that the plaintiff, at the time he purchased of the defendant, his interest in said lands, did not know that there was any prior or paramount claim or right thereto in any other person, or that any other person held any certificate for the purchase of said lands, or any

June Term,
1860.

HURD
v.
HALL.

part thereof, but believed that the defendant was entitled, by virtue of said certificates, to a conveyance from the state, of one-half of each of said lots of land, upon paying the residue of the purchase money, and that the assignment of said certificates by the defendant, would transfer such title to the plaintiff.

The complaint further alleged, that the plaintiff, shortly after the purchase of said certificates from the defendant, was informed, for the first time, that there were outstanding claims upon said lands, and upon inquiry, ascertained the fact to be, that on the 12th of July, 1850, the said commissioners of school and university lands sold to one Orton said lots 118, 121 and 122, and to one Holton, said lot 120, and to one Haight, said lot 116; and that although said purchasers had made default in the payment of interest accruing upon said certificates, the said commissioners had not re-offered said lots, or any of them, at public sale, as required by the statute in such case, and that therefore said purchasers still retained a right to the conveyance of said lots of land, upon paying the balance due to the state therefor, and that the certificates for said lots 116, 118, 120, 121 and 122, so issued to the plaintiff and defendant, and to said Botkin and Seaver, respectively, were, in fact, issued without authority of law, and were void.

The complaint also alleged that the defendant informed the plaintiff that, at the time of the purchase of said lots from the state, he was told by the said commissioners, that said sales to said Orton and Holton, and the certificates issued to them, had become forfeited, and that said lots were subject to private sale; and that the plaintiff, and, as he believed, the defendant also, was in fact entirely ignorant of what proceedings were necessary to be had, as well as what proceedings had in fact been had, to divest the interest of said Orton and Holton in said lots respectively; but that said plaintiff and defendant, relying upon what they learned from the said commissioners, did, in fact, believe that the proper proceedings had been taken to foreclose the right of Orton and Holton in said lands, and that the state had good right to sell the same to the plaintiff and defendant.

June Term,
1860.

HURD
v.
HALL.

The complaint further alleged, that the defendant, after notice of the failure of the plaintiff's title under said certificates, transferred before maturity the note which became due June 3d, 1857, and the plaintiff paid the same to the holder; that the defendant is still the holder of the two other notes; that in July, 1857, the plaintiff requested the defendant to deliver up to him said two notes, and refund the money he had paid, and tendered to the defendant the certificates for said lots 118, 120, 121 and 122, with a reassignment of the defendant's interest therein, but the defendant refused to comply with such request; that at the time of said demand, the plaintiff did not know that lot No. 116 had ever been sold to said Haight, or that the certificate for said lot purchased from Botkin & Seaver, was rendered invalid in consequence of the previous sale to said Haight, but the plaintiff had learned that fact since the commencement of this suit. The complaint further stated, that the quantity of land embraced in all said certificates, is 208 1-2 acres; that the certificates bought of said Perkins embraced 60 acres, which are of no greater value per acre than the residue of the land; that the sum of $654 50, (which the plaintiff paid the defendant at the date of the contract,) is a full consideration for the assignment of the defendant's interest in the certificates for said 60 acres; but that the plaintiff is willing to reassign to the defendant the interest which defendant assigned to him in the certificates purchased of Perkins, and in that purchased from Botkin & Seaver, upon the repayment by the defendant of the money he had advanced upon the contract, and the return to him, of his two promissory notes yet unpaid. The complaint also alleges, that the plaintiff has been informed and believes, that the defendant, at the time he assigned said certificates, knew that the certificates were invalid. Prayer, that the promissory notes unpaid may be delivered up to be cancelled, and that defendant may be ordered to repay the plaintiff the moneys so paid by him, with interest, and receive a reassignment, &c., and for such other or further relief as may be equitable.

The defendant answered the amended complaint by a general denial.

On the trial, the issuing of the certificates by the commissioners of school and university lands, to the plaintiff and defendant, on the 2d day of October, 1854, for lots 118, 120, 121 and 122; the purchase by the plaintiff and defendant from Perkins, of the certificates for lots 117 and 123; the purchase by them from Botkin & Seaver, of the certificate for lot 116; and the assignment by the defendant to the plaintiff, of his interest in all said certificates, as stated in the complaint, were either proved or admitted. It was also proved or admitted, that said lots 118, 120, 121, 122 and 116, had been sold by said commissioners in 1850, to Orton, Holton and Haight, respectively, and that the commissioners had issued certificates of sale for said lots to the plaintiff and defendant, and to said Botkin & Seaver, respectively, without having first offered the lots, or either of them, for resale at public auction, as required by the statute.

The plaintiff, *Hurd*, was then sworn as a witness in his own behalf, and testified as follows: "The first I knew about the school lands being sold, the defendant came to my house and wanted to borrow some money. He said the school land was advertised for sale, and he was going to buy it or see about it; there was something said by one of us about my going in with him; I let him have what money I had, one hundred dollars or more; *Hall* started to Madison to purchase the lands, and came back and said he had purchased; he said it was for sale, and he purchased it; each one of us paid half the purchase money; I don't know that *Hall* said anything but that the land had been offered for sale by advertisement; he wanted me to go to Milton to see who owned the 60 acres; I went, and found Perkins owned it; he went to Milwaukee and bought that; he went to Madison and bought 20 acres more of Botkin & Seaver; we took possession soon after, and went to making improvements on Perkins' and Botkin's lots; cut wood and fenced one hundred acres. The next spring I was at *Hall's;* he said half was not enough to make a farm; he proposed to cast lots as to who should make the offer to buy or sell, and it fell to my lot to make the offer; I said I would give or take $30 per acre, deducting what was going to the state; he said he

would sell, but if I had said $28 per acre, he would have purchased it; I paid him the money, over six hundred dollars, and gave him notes for $1,500; I have paid one note of $500 since, with interest at 12 per cent.; it was due June 23d, 1857; the other notes were payable June 23d, 1858, and June 23d, 1859. Before the original summons and complaint in this suit were served, but on the same day, I offered the defendant to reassign the certificates; I tendered him the certificates for lots 118, 120, 121 and 122, with assignments on the back, and asked him to deliver the three notes and pay back the money I had paid him; requested the three notes or the two, and the money I had paid. He said he had nothing to do about it. Two or three weeks after I bought *Hall* out, I was told there was some prospect of my losing my land. *Hall* said he did not believe anything in it; he did not believe the original purchasers would ever redeem it; said he believed the state was holden for the land they sold. I knew of the original sale in 1850."

The following question was propounded to the witness by his own counsel: "What did you know about these lands being forfeited, and who did you learn it from?" Question objected to; objection overruled, and defendant excepted.

*Answer.* "*Hall* came to me and said it was forfeited, and was advertised for sale."

Also the following question: "State whether you knew anything about the lands being reoffered at public sale; if so, what did you know?" Question objected to; objection overruled, and defendant excepted.

*Answer.* "I never knew it was necessary to reoffer them at public sale. I never knew anything about their being reoffered. I don't know that I ever told *Hall* that certificate for lot 116 was bad. I had not learned it was bad when this suit was commenced. I think *Hall* did not have a paper with advertisement of school land when we talked about buying. I had seen no advertisement before I and *Hall* purchased."

*On cross-examination,* the defendant proposed to prove,

by the witness, that he had *purchased in* the original certificates of sale for a small sum, and that he then held said certificates. The plaintiff objected to this evidence; the court sustained the objection; and the defendant excepted.

The defendant, *Hall*, was then sworn in his own behalf, and testified as follows : "In the winter before *Hurd* and I purchased the land, *Hurd* wanted me to look around and see if we could get hold of this land. The September following my attention was called to the Democratic *Standard*, in which a notice was published, and I took it up to *Hurd*. We examined the advertisement, figured up the amount of interest, principal and penalties, to know how much money we wanted to secure the land. We decided to take lots 120, 121, 122 and 118. Lot 116 we decided not to take, because the amount due was more than the land was worth. I read the advertisement to *Hurd*. I came to Madison, and got new certificates in my name and his. I did not learn where *Perkins* lived, but ascertained he owned certificates for lot 117 and lot 123. I purchased of *Perkins* his old certificates. *Hurd* said he had talked with *Goodrich* about the certificates. It was understood that the Mil. & Miss. R.R. Co. had an interest in the land, although the certificates were issued to Holton and Orton. *Hurd* said they told him that they had paid all they were going to on the land, and if we wanted it, to come and get it. We did not get the certificates until January, 1855. We applied for them the preceding October. It was on the 22d of June, 1856, that I sold out to *Hurd*. We let the writing run back two or three weeks. I knew nothing about the original certificates holding the land, but *Hurd* and I both knew there were such certificates. I knew nothing about the case pending in the supreme court, or the decision, until three or four weeks after we made the writing. *Hurd* took the exclusive possession at once, I reserving the right to take off my wheat. I paid for one-half of the breaking. *Hurd* never offered to rescind the contract. The day before the suit was commenced, he tendered me the four certificates, and the note he had paid. *Hurd* is in possession. The eighty acres cleared is all planted to corn. There is a piece in back of the eighty, that

*Hurd* has cut the timber from. Lots 116, 117 and 123 were, at the time of the sale to plaintiff, worth $35 to $40 per acre. 118 and 122 were worth $25 an acre, 121 about the same, 120 not worth more than $15 to $18 per acre. I told *Hurd*, in the conversation with him, that I only sold my right, title and interest in the certificates; he was to take all contingencies. He and I both knew the land had not been offered for a resale at public action. I knew it from the advertisement. I never told *Hurd* the school lands had been forfeited according to law. The conversations I have given, were the only ones I had with him."

The advertisement in a newspaper, of which the following is a copy, was here offered in evidence and read:

"FORFEITED SCHOOL LANDS.
*Office Commissioners School and University Lands,* }
Madison, September 20th, 1854.         }

"The following described lands in Rock county, having been forfeited by reason of the non-payment of interest, are subject to private entry by any person applying therefor, at the price named opposite each tract, which includes the amount due at the time of the forfeiture, the interest up to January 1st, 1855, and 5 per cent. damages; to the sum of which will be added the cost and charges of advertising and sale. The per centage of the principal payable at the time of purchase, will be fixed by the commissioners, and will not be less than that required at the original sale.

[Here follows a list of lands in which are included lots 118, 120, 121 and 122, with statement of the amount due, &c.]

(Signed)          "ALEXANDER T. GRAY,
                            Secretary of State.
                    E. H. JANSEN,
                            State Treasurer.
                    GEO. B. SMITH,
                            Attorney General."

The finding of the circuit court as to matters of fact and its conclusions of law, were in favor of the plaintiff, and

judgment was entered, "That the said contract of sale of all of said lots by said defendant to the said plaintiff, and the assignment of the said seven certificates, be cancelled, rescinded and set aside; that the said two notes now unpaid be delivered up and cancelled; that the said defendant pay to the plaintiff the said $654,50, and the sum of $560, with interest thereon, from the time of such payment, and also, one half of all sums paid by the said plaintiff for taxes upon said several lots, and all interest paid by the plaintiff to the state thereon, after deducting from the same the value of the use of said sixty acres, and the benefit derived by the plaintiff therefrom. Or, that the sales of said lots 116, 118, 120, 121 and 122, by defendant to the plaintiff, be set aside, and the assignment of the five certificates therefor, be cancelled, and the said sales as to the lots 117 and 123, do stand, and that the said two notes now unpaid be delivered up and cancelled, and that the value of the said sixty acres in said lots 117 and 123, as compared with the value of the residue, be deducted from the money paid at the time of the purchase, to-wit: the sum of six hundred and fifty-four dollars and fifty cents; and the money paid on the said note, to-wit, the sum of $560; and that the residue of the said two sums be paid by the said defendant to the plaintiff; that the said defendant have his election whether he will have the assignment of the seven certificates cancelled, or the assignment of the said five certificates only; that it be referred to a court commissioner to make and state an account, &c., and report the same to the court, and upon the coming in and confirmation of such report, the defendant shall elect, &c." To the decision and finding of the court, both as to the facts and the law, the defendant excepted, and from the judgment rendered in accordance therewith, the defendant appealed.

*Bennett, Sloan & Patten,* for appellant:

I. There was no agreement or covenant on the part of the defendant as to the validity of the certificates, nor is he charged with having been guilty of any fraud, misrepresentation or deceit. The plaintiff is therefore without remedy. Where both parties are ignorant of a defect, which renders

the property sold unavailable to the purchaser, or where a fact in regard to the land is equally unknown to both parties, or each has equal information, or the fact is doubtful from its own nature, and the parties have acted in good faith, equity will not interpose. *Bates vs. Delavan*, 5 Paige, 299; 2 Kent, 470, note; *McCobb vs. Richardson*, 24 Maine, 82; *Gouverneur vs. Elmendorf*, 5 Johns. Ch. R., 79; Rawle on Cov. for Title, 460–1. Courts of equity will not relieve against mere ignorance of law, not coupled with fraud, misrepresentations or undue influence, 1 Story Eq. Jur., p. 132, § 116, and p. 121, § 128. If there be no fraud and no covenants, the purchaser is without remedy either at law or in equity. *Abbott vs. Allen*, 2 Johns, Ch. Rep., 519; 1 Fonb. Eq., 336, note; 4 Cruise Dig., 90; Cooper's Eq. Rep., 311; *Urnston vs. Pate*, cited Sug. on Vendors, 3d ed., 346–7. But it is said that the parties entered into this contract under a mistake of fact; that they both supposed that the certificates were valid, and that such belief constitutes a mistake of fact. But what fact were they mistaken about? Both testify that they knew these lands had been sold before, and that the original certificates were outstanding. The plaintiff testifies that he was present at the original sale, and also that he never knew it was necessary to re-offer them at public sale, and knew nothing about their being re-offered. The defendant testifies that he and the plaintiff both knew, from the advertisement, that the land had not been offered for re-sale at public auction. If the plaintiff can recover in this action, a quit claim deed is as good in every case of sale of an interest in lands as a warranty deed, for always where a vendee pays a valuable consideration, he believes he is receiving an equivalent, and the vendor either shares in that belief, or is guilty of deceit in concealing the defect in his title.

II.   If the fact, at the time of an agreement, is equally unknown to, or is equally within the knowledge of, or is equally accessible to both parties, courts will not relieve in the absence of fraud, misrepresentation or deceit. If the grantee accept a conveyance of land without covenants, he cannot recover back the consideration money; *Rosevelt vs.*

*Fulton*, 2 Cow., 129; *Taylor vs. Hare*, 1 N. H., 260; 2 Atk., 592; 1 Story Eq. Jur., § 150; 1 Fonb. Eq., B. 1, Ch. 2, § 7, note V; 2 Pow. on Con., 200; 1 Mad. Ch. Pr., 62–4; *Emerson vs. Washington*,, 9 Maine, 88; *Norton vs. Marden*, 15 Maine, 45; 4 Green., 101; 14 Me., 133; 1 Wend., 185.

III. If there was any mistake in this case, it was a mistake of law, as to the validity of the session law of 1853, ch. 43; and no authorities need be cited to show that a party is not entitled to relief on account of a mistake of law.

IV. The court erred in excluding the evidence offered by the defendant, to show that the plaintiff had purchased in the original certificates for a smaller sum; 2 Parsons on Con., 498–9; *Tanner vs. Livingston*, 12 Wend., 83; *Sping vs. Chase*, 22 Maine, 505; *Leffingwell vs. Elliot*, 8 Pick., 455; 10 id., 204; *Loomis vs. Bedel*, 11 N. H., 74, 87; *Smith vs. Compton*, 3 Barn. & Adol., 407.

*Williams & Patterson*, for respondent:

A mistake of law occurs when a person is truly acquainted with the existence or non-existence of all the facts, but is ignorant of the legal consequences. An error of fact takes place, either when some fact which really exists is unknown, or some fact is supposed to exist, which really does not exist. 2 Ev. Poth. App., 437, (379). The mistake of the parties in this case was purely a mistake of fact, and the plaintiff was entitled to the relief granted in the court below. *Union Bank vs. Bank of the U. S.*, 3 Mass., 74; *Haven vs. Foster*, 9 Pick., 112; *Mowatt vs. Wright*, 1 Wend., 355; *Burr vs. Veeder*, 3 Wend., 412; Smith on contracts, 421 (a); 2 Smith's Leading Cases, 237; 1 Story's Eq. Jur., 162–70; 1 Vesey Sen., 126; *Irick vs. Fulton*, 3 Grat., 193; *Bell vs. Gardiner*, 4 M. & G., 11, (43, E. C. L., 16); *Milnes vs. Duncan*, 6 B. & C., 671, (13 E. C. L., 293); *Kelly vs. Solari*, 9 M. & W., 54; *Gompertz vs. Bartlett*, 24 Eng. L. & E. R., 156; *Young vs. Cole*, 3 Bing. N. C., 724, (32 E. C. L., 302); *Lambert vs. Heath*, 15 M. & W., 484.

If this was not a mistake of fact, it was such a mistake of law or of mixed law and fact, as courts of equity will relieve against. *Champlin vs. Laytin*, 6 Paige, 189; *Same vs. Same*,

June Term,
1860.
_____
HURD
v.
HALL.

18 Wend., 407; *Many vs. Beekman Iron Co.*, 9 Paige, 188; *Schermerhorn vs. Barhydt*, 9 Paige, 28; *Pitcher vs. Turin Pl. R. Co.*, 10 Barb., 476; 3 B. Monroe, 514; 11 Ohio, 223, 480; 5 Conn., 528; 9 Paige, 443; 14 Ill., 286; 7 How., (U. S.), 133; *Moredock vs. Rawlings*, 3 Mon., 73; *Bedel vs. Smith*, id., 290; *Tribble vs. Davis*, 3 J. J. Marsh., 633.

June 19.    *By the Court*, DIXON, C. J.    That both the parties to this suit acted under a radical mistake, either in matters of law or in matters of fact, in the transaction disclosed by the record, can hardly admit of denial or doubt.    That such was the case with the plaintiff seems still less questionable.    It is impossible to suppose that he would have purchased the certificates in question at the price agreed upon, if he had known that they were worth less than so many pieces of blank paper.    The fact that they were so, proves almost conclusively that he was in some way deluded or misled.    As it is only against mistakes of fact that courts will grant relief, it becomes necessary, in the first instance, to ascertain the nature of that here complained of, in order to determine whether the plaintiff is entitled to maintain his action on that ground.    If it was a mistake of law, there being no averment or proof that any fraud or imposition was practiced upon him, he must abide the consequences of his ignorance, and cannot, on that account, be permitted to avoid his contract.    But if it was a mistake of fact, the action may be maintained, unless it falls within some of the exceptions to the general rule, that "ignorance of a material fact may excuse a party from the legal consequence of his conduct."

A mistake of law happens, when a party, having full knowledge of the facts, comes to an erroneous conclusion as to their legal effect.    It is a mistaken opinion or inference‘ arising from an imperfect or incorrect exercise of the judgment, upon facts as they really are; and like a correct opinion, which is law, necessarily presupposes that the person forming it, is in full possession of them.    The facts precede the law, and the true and false opinion alike imply an acquaintance with them,    Neither can exist without it.    The one is the result of a correct application to them of legal

June Term,
1860.

HURD
v.
HALL.

principles, which every man is presumed to know, and is called law; the other the result of a faulty application, and is called a mistake of the law. I do not find, in any of the reports or commentaries, a concise and accurate definition of such mistake; but, after an examination of the principal adjudged cases, I believe that the foregoing is substantially correct. I believe, also, that no case will be found, where courts have refused relief on the ground of a mistake of law, in which it did not clearly appear that the party to whom such relief was denied, was fully apprised of all the facts from which such mistaken conclusion was drawn; and that those instances of confused mistake of law and fact, where relief has sometimes been given, and sometimes denied, and which may at first seem to be exceptions to this rule, will, when closely scrutinized, be found not to be so, but to fall within the rule and its exceptions, that *ignorantia facti excusat*.

An error of fact, *ignorantia facti*, is ordinarily said to take place, either when some fact which really exists, is unknown, or some fact is supposed to exist, which really does not exist. The most frequent, familiar and striking examples of such error, are found in those cases in which the books abound, and to which we need not here particularly refer, where the parties are deceived or mistaken as to the existence or non-existence of certain facts, materially affecting the transaction, and which are present in their minds at the time of entering into the agreement, and directly influence their conduct in so doing. But as is implied from the maxim, *ignorantia facti excusat*, and from the definition which we have given, of a mistake of law, a *mistake of fact* has, in legal parlance, a much more enlarged signification, and extends to and includes the case of a party who, through *mere ignorance* of the existence or non-existence of a material fact, is induced to do an act, or enter into a contract injurious to himself, where, if he had been informed of the existence or non-existence of such fact, he would not have performed such act or made such contract. Ignorance of the existence or non-existence of a material fact, precludes the idea that the party, at the time of the transaction, should have been influ-

enced by it, for it is impossible that the mind should be moved by that of which it knows nothing. This ignorance of facts must be excusable, that is, it must not arise from the intentional neglect of the party to investigate them. The rule which formerly prevailed, that if a party might, by the exercise of reasonable diligence, have ascertained the facts, he would not, on the ground of ignorance or mistake, be relieved from his contract, has of late been very much relaxed. The later cases establish the doctrine, that whenever there is a clear *bona fide* mistake, ignorance or forgetfulness of facts, the contract may, on that account, be avoided. The following cases illustrate the doctrine that mere ignorance or forgetfulness of facts, without intentional neglect to examine them, excuses, and, in some particulars, seem to bear strongly on the present case. In *Milnes vs. Duncan*, 6 B. & C., 671, (13 E. C. L., 293,) an action for money paid in ignorance of fact, was sustained under the following circumstances: A bill of exchange, drawn in Ireland upon the stamp required by law there, but which was less than the stamp required for such a bill drawn in England, was negotiated and sold in England. There was nothing on the face of the bill to show that it was drawn in Ireland. The holder in England neglected to present it for payment, and held it for a month after it was due. The acceptor having become bankrupt, the holder applied to the endorser, from whom he had received it, for payment. The latter refused to pay it, alleging that the holder had made it his own by his laches. The holder then threatened suit, alleging that the bill was void for being drawn on an improper stamp. The indorser inspected the bill, and finding that the stamp was not that required for a bill of the same amount drawn in England, and ignorant of the fact that it had been drawn in Ireland, paid the amount to the holder.

In the case of *Kelly vs. Solari*, 9 M. & W., 54, it was held, that money paid under a *bona fide* forgetfulness of facts, might be recovered back in an action for money had and received. The late husband of the defendant had effected a policy on his life in the Argus Assurance Company. He died in October, 1840, leaving the defendant his executrix,

not having (by mistake) paid the quarterly premium on the policy, which became due on the 3d of September preceding. In November the actuary of the office informed two of the directors that the policy had lapsed by reason of the non-payment of the premium, and one of them, thereupon, wrote upon the policy, in pencil, the word "lapsed." In February, 1841, the defendant, as executrix, applied at the office for, and received from the same and a third director, payment of the sum secured on the policy. The two directors stated in evidence, that they had entirely forgotten, at the time of payment, that the policy had lapsed. Lord ABINGER, C. B., says: "I think the knowledge of facts which disentitles the party from recovering, must mean a knowledge existing in the mind at the time of payment." PARKE, B., says: "If indeed the money is intentionally paid, without reference to the truth or falsehood of the fact, the plaintiff meaning to waive all inquiry into it, and that the person receiving shall have the money at all events, whether the fact be true or false, the latter is certainly entitled to retain it; but if it is paid under the impression of the truth of a fact which is untrue, it may, generally speaking, be recovered back, however careless the party paying may have been, in omitting to use due diligence to inquire into the fact." To the same effect is the case of *Bell vs. Gardiner*, 4 M. & G., 11, (43 E. C. L., 16,) where it was held to be a good defense to a promissory note, that it was given by the maker in payment of a bill of exchange which he had endorsed for the accommodation of the drawer, and which bill, after it was so endorsed, had, with the consent of the drawer, been altered in a material point, of which alteration the maker of the note, *though he had ample means of knowing it*, was ignorant at the time he gave it. The court say: "that it must now be taken, that it is no answer in an action for money had and received, brought to recover back money paid by mistake, to say that the party had the means of knowing the facts, if he had not the knowledge in reality:" Such means of knowledge are strong circumstances to go to the jury, to prove that the party had the knowledge, but do not preclude a recovery.

These cases are understood as expressing the doctrines of

the English courts, except in cases where the party is chargeable by law with constructive notice of the facts, or where he willfully assumes them, or waives an investigation after his attention has been invited to them; or where motives of public policy require that he should bear the consequences of his mistake, such as a mistake by bankers in the payment of forged bank notes or drafts.

The case of *Champlin and others vs. Laytin*, and *Laytin vs. Champlin and others*, in the court of chancery of New York, 6 Paige, 189, and afterwards in the court of errors, 18 Wend., 407, cited by the counsel for the defendant, so strikingly resembles that which we are now considering, in many of its features, its doctrines so clearly accord with those of the English courts, and sustain the definitions we have given of a mistake of law, and a mistake of fact, that we feel warranted in stating the facts, and the conclusions of Chancellor WALWORTH and Judge BRONSON, somewhat minutely. The facts, as they appear from the opinions of Judge BRONSON and Vice-Chancellor McCOUN, were these. Fifth street, in the city of New York, running from Broadway to Mercer street, through lands owned by Elizabeth Dupeyster, deceased, of whose estate Champlin and others were executors and trustees, was laid down on a map, made for the corporation of the city in the year 1817. In 1821, the executors caused a map of the lands of the testatrix to be made, on which Fifth street was laid down to correspond with the city map. They afterwards made sales in pursuance of this survey, and, in January, 1822, they sold and conveyed a lot to Samuel Whittemore, extending from Broadway to Mercer street, and which, by the terms of the deed, was bounded on one side for the whole distance by Fifth street. According to the decision of the supreme court of that state, made in 1825, *Mercer Street Case*, 4 Cowen, 542, such sale and conveyance did not amount to an implied grant of a right of way to the purchaser over the proposed street, and the executors, when the street should be opened, would be entitled to be paid the full value of the land, without regard to the supposed easement. The executors, acting on their belief that their sale to Whittemore had not affected their

interest in the land required for the proposed street, survey-
ed the same into lots, and in January, 1828, sold and con-
veyed to Laytin, the two lots which were the subject of con-
troversy in that suit. In the case of *Lewis Street*, 2 Wend.,
472, decided in 1829, the case of *Mercer Street* was recon-
sidered and overruled; and the principle of the last decision
was approved in several subsequent decisions. After the
decision in. the case of *Lewis Street*, the corporation of the
city ordered Fifth street to be opened, and Laytin was only
allowed a nominal consideration, five dollars, for his two
lots, on the ground that the previous acts of the executors,
in selling and bounding lots on the streets, amounted to a
grant of a perpetual easement, or right of way over the land.
Laytin purchased the lots at the price of $4,300, one-half of
which he paid down, and gave his bonds and mortgages to
secure the residue. Before the conveyance to him. was exe-
cuted, he was informed that his two lots lay in the site of
the proposed street. Both he and the executors entertained
the belief, that he would acquire a perfect title to the lots,
and should the street be opened, he would be entitled to re-
ceive full compensation for the land, without prejudice
from any previous acts of the executors. In 1836 the exe-
cutors filed their bill for a foreclosure and sale under the
mortages, and for a decree over against Laytin for any de-
ficiency. Laytin filed his cross bill to have the mortgages
given up and cancelled, and for a return of the money paid
by him on account of the purchase, on the ground of mis-
take. This led to the discussion of the question whether it
was a mistake of law or a mistake of fact, and if it was a
mistake of law, whether Laytin was entitled to relief on that
ground. The Vice-Chancellor held that it was a mistake
of law, and that he was entitled to relief on account of it.
The Chancellor and Judge BRONSON, and with him the
court of errors, except PAIGE, Senator, repudiated the doc-
trine that a mistake of law could be relieved against, but
held that it was a mistake of fact, and that on that account
he was. entitled to have the mortgages given up and cancel-
led, and the purchase money refunded. It will be recollect-
ed, that by the terms of the conveyance to Whittemore, his

lots were bounded on Fifth street. The executors, in their answer to the cross bill, admitted that, in the full belief that they had a perfect title to the lots, they so represented to Laytin, at the time of the sale; but they relied on showing that he had knowledge of the contents of the Whittemore deed, through Mr. Fitch, who was his counsel at the time of his purchase, and who made an abstract of the title, in which that deed was conspicuously noted. On his examination, he said, that in the registered certificate annexed to his notes of searches, that deed was mentioned, and he gave a copy of the short note made by the register, in which the lot was described as "No. 7, Dupeyster's map." He added, that he did not remember examining the deed; he thought it very doubtful whether he did, for he saw that number on the map, and it was not the property he was searching for. He further said, that he had no recollection of having examined the record of any of the deeds referred to by the register. He thought he did not. The Chancellor and Judge both observed that it was not a case for the application of the doctrine of constructive notice, for the reason that the Whittemore deed did not constitute a link in the chain of title which Laytin was investigating, and through which he claimed; and because the testimony of Fitch did not establish that he had knowledge of the fact, that, by the terms of the conveyance, Whittemore's lot was bounded by the street, they held that it was a mistake of fact. Though much reliance is put upon the fact, that the executors, in good faith, represented their title as good, still a much stronger case, showing that the *mere ignorance of a fact will excuse*, under circumstances, where the exercise of very slight diligence in making inquiry, would have placed the party in possession of it, where the means of knowledge were at hand, and where his attention was apparently called to its investigation, cannot well be put.

The material fact upon which the rights of the parties turned, was the bounding of the Whittemore lot by the street in the deed to him, and because it did not affirmatively appear that Laytin's attorney had notice of it, he was relieved. The attorney and Laytin himself both knew of the map of

1817, and of the sale and conveyance to Whittemore, and that it was made by that map, and where his deed was recorded; but it did not appear that they had ever read or knew its contents. The court seem to have gone upon the doctrine, that where it is evident that a party was laboring under an injurious mistake, either of law or of fact, and the testimony does not clearly show that he knew the facts, or leaves it doubtful whether he did or did not, that it will be taken to be a mistake of fact; and that under such circumstances the burden of showing that he knew the facts, and that therefore it was a mistake of law, will be thrown on his antagonist, who seeks to take an unfair and unconscionable advantage of him. Because the executors did not show that Laytin knew the facts, they were decreed to surrender the mortgages and refund the purchase money. A mistake of law cannot be presumed. The presumption is the other way; and from its nature, the court must be able to say that the facts were known, before it can say that the mistake has been committed. For otherwise it would at once be indulging in two contradictory and conflicting presumptions; that the party both knew and did not know the law, at the same time; which would be absurd. Nor will the court, for the sake of burdening a party with a penalty, and of giving his adversary an undue advantage, first presume that he knew the facts, and upon such presumption, inflict upon him the dangerous responsibility of knowing the law. It must first be shown that he knew the facts, with which an acquaintance cannot be presumed, and then he is responsible for a proper application of the law. 1 Story's Eq. Jur., § 140.

An application of the foregoing principles to the facts of the present case, renders its determination a very plain matter. The material fact upon which the validity of the certificates for lots 116, 118, 120, 121 and 122 depends, is whether the commissioners of the school and university lands did, in the years 1853 and 1854, reoffer the lots for sale at public auction, by reason of the non-payment of the interest and damages due for those years upon the certificates of sale of them made in 1850. If they did, then

the certificates were valid, and the title of the holders, subject to the payment of the purchase money and interest, was good; otherwise they were invalid, and conveyed no interest in the lots; the rights of the holders of the certificates of 1850 were unforfeited, and the lands were not subject to private entry. There is no dispute that the lands were not so reoffered, which, under the decision of this court, in *Damman vs. The Commissioners of the School and University Lands*, 4 Wis., 114, renders them void. Both parties knew of the sales of 1850, and that the certificates then issued were outstanding. But did they know whether the lots had been reoffered for sale at public auction, so as to work a forfeiture of those certificates, and subject the lots to private entry? *Hall* testifies that he did know it, and therefore, to suppose him to be an innocent party in the transaction, we must believe that he was mistaken in the law, in supposing that no reoffer was necessary in order to enable him to make the entry. Did *Hurd* know whether such reoffer had been made or not? He testifies positively that he did not; that he did not know that it was necessary to do so. We believe in the truth of his statement, and are fully satisfied that it was so. He was wholly ignorant upon the matter. It is true that *Hall* attempts to testify that *Hurd* knew that the lots had not been reoffered. But he does it in a manner which leads us almost to doubt whether he knew it himself. He says he knew it from the advertisement of the commissioners; that he exhibited the advertisement to *Hurd*, and therefore he infers that *Hurd* knew it. A copy of the advertisement is contained in the record, and from it we must say that we could draw no such inference. It commences by reciting that " the following described lands in Rock county, *having been forfeited by reason of the non-payment of interest*, are subject to private entry," &c. What was there in this from which an inference was to be drawn, that the lands had not been reoffered? On the other hand, was not the inference the other way? It recited that the lands *had been forfeited*, and the only legal and constitutional mode of forfeiture being that of reoffering them for sale at public auction, the only legitimate inference was that they had been so reoffered. It does not appear

whether or not the parties had actual knowledge of the act of 1853, referred to by the court in the Damman case, and which was there held to be unconstitutional. If they had, it could make no difference. It could furnish no ground for presuming a knowledge of the facts, that the party, if he had known them, might, or would in all probability, have been misled as to the law, or have committed an error, the consequences of which would have been precisely the same as those which arose from his ignorance of the facts. We are of opinion that the mistake complained of was an injurious mistake of fact, and not of law; that it was excusable in its character; and that it is against conscience for the defendant to attempt to enforce the contract; and therefore, that the plaintiff is entitled to maintain his action.

The argument of the counsel for the defendant, founded upon the character of the instruments transferred, deserves notice. They liken the transaction to a sale of real estate, and say that where there is no fraud, and no covenants are taken to secure the title, and it wholly fails, the purchaser is without a remedy, either at law or in equity. It is said that if the plaintiff can recover in this action, then a quit-claim deed is as good in every case of the sale of an interest in lands as a warranty deed; for in every case the vendee holding title by quit-claim, can, in case of a failure of title, recover back the consideration paid, and he could do no more where he has taken a warranty deed; that in every case of a purchase of land by quit-claim, when the vendee pays a valuable consideration, he does so on the supposition and belief that he receives an interest in the land, which is an equivalent, &c. If the assignments of the certificates in question could be considered as conveyances of real estate, according to any of the forms known to the law or in general use, this argument would undoubtedly be correct. But they are not. The certificates, provided they had been of any validity, were chattels real, and the assignments were the means or evidences of their transfer. They do not purport, nor were they intended, to transfer the title to real estate. The parties were not dealing with reference to, or on the supposition that the title was in either of them. They both

knew that it was in the state. They only attempted to transfer the certificates, the value of which was governed by the value of the realty which they concerned, and to which they were supposed to be annexed. The certificates being chattels real, and "falling below the character and dignity of a freehold," were only personal estate, and their assignment and transfer are governed by precisely the same rules as the assignment and transfer of other personal property. 2 Kent's Comm., 342. Such chattels, says Mr. Stephens, 2 Steph. Comm., 65, "when considered in reference to the distinction between real and personal estate, are held to fall under the latter denomination, their incidents being in general the same with those of property in movables." It will, we suppose, hardly be contended that in the case of the sale of a merely personal chattel, or *chose in action*, the purchaser would be precluded from taking advantage of a serious, detrimental mistake of fact, because he did not fortify himself with covenants. See cases of *Moredock vs. Rawlings*, 3 Monroe, 73; *Bedall vs. Stith*, id., 290, and *Tribble vs. Davis*, 3 J. J. Marshall, 633, where assignments of bonds and contracts for the conveyance of real estate are placed, by the court of appeals of Kentucky, on the same footing as assignments of other assignable instruments; and where it is said that upon such assignments there is, without express words, an implied undertaking on the part of the assignors, that the makers of the bonds or contracts have title, and will convey and are responsible for the damages in case of failure to do so; and if the assignees, with due diligence, are unsuccessful in obtaining either title or damages, they may sue for and recover back the purchase money, with interest. See, also, *Kauffelt vs. Leber*, 9 Watts & Sargeant, 93. In the case of *Purvis vs. Rayer*, 9 Price, 488, and *Souter vs. Drake*, 2 Barn. & Adolph., 992, (27 E. C. L., 250), it was held that unless there be some stipulation to the contrary, there is in every contract for the sale of a lease, an implied undertaking to make out the lessor's title to demise, as well as that of the vendor to the lease itself, which implied undertaking is as available at law as in equity. It is to be observed, however, that these last were cases of executory contracts. These authorities suffi-

ciently prove that assignments of contracts for the sale of real estate or an interest in it, and executed conveyances of it, are not subject to the same rules of construction.

The rule that there are no implied covenants on a deed of lands, and that when there are no express covenants, and no fraud, the vendee is without remedy, unless there be some mistake against which the law will relieve, grows out of the character of the instrument, and is not founded upon the nature of the property transferred. The purchaser of land who intends to have recourse in case of eviction against the former proprietor, takes care to have inserted in the instrument of conveyance the necessary covenants for that purpose, thereby ascertaining the precise extent of the liability. If the sale is made upon the understanding that the title is to be at the risk of the grantee, who is to have no remedy in case of defect, express covenants are omitted, and deeds of quit-claim are used. *Frost vs. Raymond*, 2 Caines' R., 188. The price often depends as much upon the nature of the title and form of the conveyance, as the intrinsic value of the land itself, and where there are no covenants, it is presumed that the title is at the risk of the grantee, and that there was a corresponding deduction in price. This is the interpretation which the law puts upon the contract, and unless there is some clearly relievable mistake of fact, the failure of the vendee to protect himself by proper covenants, is regarded as so grossly negligent, that courts will afford no redress, even though the title wholly fails.

This rule, however, applies only to executed contracts for the sale of real estate, and has no reference to those which are executory, upon which relief, on the ground of mistake or failure of consideration, is granted as freely as on contracts concerning personalty.

There are other grounds upon which I am of opinion that the plaintiff is entitled to maintain this action. In every sale of a chattel there is an implied warranty that it exists, and that the vendor has title to it. So, in the assignment of an instrument, even not negotiable, for a full and fair price, I think the assignor impliedly warrants that it is valid, and that the obligor is liable upon it, unless it clearly appear that the

June Term,
1860.

HURD
v.
HALL.

parties intended to the contrary. This doctrine has long been settled on common law principles, in many of the states of this Union, by courts of the highest respectability and learning, and I perceive no reason to doubt its soundness or justice. In Virginia, *Mackie vs. Davis*, 2 Wash., 219; *Norton vs. Rose*, id., 233; *Caton vs. Lenox*, 6 Rand., 31; *Coiner vs. Hansbarger*, 4 Leigh, 452; *Goodall vs. Stuart*, 2 Hen. & Mun., 105; *Mandeville vs. Riddle*, 1 Cranch, 290; *Yeaton vs. Bank of Alexandria*, 5 id., 49, and *Crawford vs. McDonald*, 2 Hen. & Mun., 189. In Indiana, *Howell vs. Wilson*, 2 Black., 418. In Kentucky, cases above referred to, and *Maupin vs. Compton*, 3 Bibb, 215; 6 Litt., 200. In Mississippi, *Lee vs. Hopkins*, 12 Smedes & Marsh., 299, In New York, *Furniss vs. Ferguson*, 15 N. Y., 437.

I also think that the action could be maintained on the ground of a failure of consideration, by reason of the plaintiff's not having obtained what he bargained for; that the instruments did not answer the description of those which the defendant professed to sell, or the plaintiff to buy. The instruments assigned, though resembling school land certificates, were not such certificates at all. They were mere worthless pieces of paper drawn up in the form of such certificates. The fact that they were signed by the commissioners in their official capacity, can make no difference, so long as they were wholly unauthorized to do so. Their acts in signing and issuing them, under the circumstances, were wholly void, and the certificates, in that respect, were no better than if they had been signed by some other persons and were sheer forgeries, except so far as recovering back the money already paid was concerned. In this respect the case seems to me to fall directly within the principle of the cases of *Young vs. Cole*, 3 Bing., N. C., 724 (32 E. C. L., 302), and *Gompertz vs. Bartlett*, 24 Eng. Law and Eq., 156. The length of this opinion will not allow a recital of the facts of those cases here. It is sufficient to say, that they were both actions between two equally innocent persons, the former as holders of four Guatamala government bonds, the latter of a bill of exchange. All the instruments appeared upon their face to be good,

but were secretly defective; the bonds being such as had theretofore been bought and sold in the London Stock Exchange, were defective in not having been produced by the holders, and stamped by an agent of the government, pursuant to an order of the government, made after their issue, but of which the parties were ignorant; the bill, in having been drawn in England instead of Sierra Leone, as it purported, and as the parties supposed it to have been. It was held that the plaintiffs, who were assignees, could, after discovery of the defect which rendered the instruments worthless, recover of the defendants, who were assignors, the money paid to them upon an assignment made when both were equally ignorant. TINDALL, C. J., in speaking of the bonds in the former case, says: "It seems, therefore, that the consideration on which the plaintiff paid his money, has failed as completely as if the defendant had contracted to sell foreign gold coin, and had handed over counters instead. It is not a question of warranty; but whether the defendant has not delivered something which, though resembling the article contracted to be sold, is of no value." I think the cases fully sustain the position.

On these two last propositions, however, I have not consulted my brethren, and they are, therefore, given as my own conclusions, and not those of the court.

Although we agree with the circuit judge on the main question involved in the case, still the judgment must be reversed on another point. We think he erred in not allowing the defendant to show that the plaintiff had bought in the original certificates for the lots to which the title failed, at a less sum than the price agreed to be paid by him to the defendant for his interest. In analogy to the rule of damages which obtains in actions for a breach of the covenant of seizin (2 Parsons on Contracts, 498, and cases there cited), and in actions upon executory contracts for the sale of real estate (*Thredgill vs. Pintard*, 12 How., U. S., 24, and authorities there cited by counsel for appellee), where the vendee in possession, has bought in an outstanding or paramount title, we are of opinion that if the plaintiff here has bought in the outstanding certificates, so as to procure a

June Term,
1860.

good title, for a less sum than the price agreed to be paid to the defendant, he is entitled to have his notes cancelled, and his money refunded, only to the extent of what he has expended in procuring such good title. Therefore, the plaintiff, after deducting one-half of the value of the 60 acres to which he acquired a good title, as compared with the value of the residue, according to the price agreed to be paid for the whole, is entitled to have his notes cancelled, and money refunded; *unless* he has perfected his title by buying in the outstanding certificates, or otherwise, at a rate less than that which he agreed to pay the defendant, in which case he is entitled to have one-half of the sum so paid to perfect his title, deducted from the price which the defendant was to receive, and he is to account to the defendant for the residue or excess.

The judgment of the circuit court is, therefore, reversed, and the cause remanded for further proceedings in accordance with this opinion.