ABBOTT, Appellant, vs. Dow and others, Respondents.

*November 9—November 26, 1907.*

*Vendor and purchaser: Rescission of contract by purchaser: Mutual
mistake: Evidence: Damages: Laches.*

1. Where the minds of parties to a writing have met on the sale
   and purchase of a particular parcel of land and they sign the
   writing which both suppose describes that parcel, but which by
   clerical error describes some other, a case is presented for a
   court of equity to ascertain the true agreement and interpose
   to prevent the writing, as far as it is variant, being enforced
   as the contract of the parties, in the absence of negligence or
   acquiescence.
2. In an action by a purchaser to rescind a written contract of
   purchase of land on the ground that it described a tract other
   than that agreed upon, under the evidence, stated in the opin-
   ion, the writing is *held* to declare that the vendee had purchased
   that which he never agreed to, by such a mistake as enabled
   a court of equity to look back of the writing to the real agree-
   ment.
3. In such case the vendors, without fault on their part and before
   the discovery of the mistake, having parted with the land
   agreed to be conveyed, and being disabled from specifically per-
   forming the real contract, it is *held* that merely relieving the
   parties from the apparent contract without attempting to en-
   force the contract they did make either by specific performance
   or award of damages was as far as a court of equity ought to go.
4. In such case the court directed judgment canceling the written
   instruments, and that the vendors refund the money payment
   and also cancel and surrender the unpaid promissory notes
   given to evidence the postponed instalments of the purchase
   price.
5. In an action by a vendee to rescind a written contract of pur-
   chase of land, the vendee, under the evidence, stated in the
   opinion, is *held* not guilty of laches.

APPEAL from a judgment of the circuit court for Dane
county: E. RAY STEVENS, Circuit Judge. *Reversed.*

Plaintiff claims that he went to North Dakota, at the solic-
itation of the defendants, to examine lands with view to pur-

chase; that he was taken by defendants' agent to the line between sections 32 and 33 in township 146 N. and range 93 W., in Mercer county; that section 32 was government land and open to homestead, while section 33 and many thousands of acres of other lands in the general vicinity were owned by the defendants for sale, all of said section being classed by them as $7 per acre land; that after examining the government section he expressed approval of the N. E. ¼ thereof and also examined the adjoining quarter-section, the N. W. ¼ of 33, belonging to the defendants, with a view to purchase that in connection with his homestead entry; that, while no definite conclusion was reached or declared when in the neighborhood of the lands, he expressed this purpose to the defendants' agent; that thereupon the parties returned to Dickinson, where there was a land office, and, with the aid of defendants' agent, Welton, he duly entered the N. E. ¼ of section 32, and that his decision to purchase the adjoining quarter-section was then communicated to Welton, who proposed to draw land contracts. Accordingly the latter brought forth two blanks and seated plaintiff and one Rhodes at a table and dictated to them the written matter to be inserted in the blanks, which they both wrote at the same time from this dictation, and thus inserted description. In both contracts the land was first described as the N. E. ¼ of section 32. The contracts were signed with some haste on July 9, 1904, and the duplicate which had been written by the plaintiff was kept by Welton, while the other duplicate, marked by Welton "Copy," was left with Rhodes to be delivered to the plaintiff when he should have made his first payment. He made that payment in a few weeks and gave promissory notes to evidence subsequent payments, viz., $200 November 1, 1904, $300 November 1, 1906, and $400 November 1, 1909, and received that copy of the contract which had been written by and left with Rhodes, and made another payment of $200 and interest in November, 1904. About April, 1905, he

again went to North Dakota to make some improvement on his homestead land, and was informed that the adjoining quarter-section, namely, the N. W. $\frac{1}{4}$ of section 33, was claimed to have been purchased from the defendants by a stranger. He thereupon examined his land contract and found that it did not describe that quarter-section which he supposed he had purchased, but did describe the N. E. $\frac{1}{4}$ of section 32, which was land that the defendants did not own and which he had entered from the government. He immediately communicated with them and requested them to change the contract so as to describe the lands which he had bought, and they replied that the copy of the contract in their possession covered the N. E. $\frac{1}{4}$ of section 33, and when their copy of the contract was introduced in evidence it disclosed that the 32 in figures had been changed, apparently with the same indelible pencil with which written, to 33. That paper had been written by the plaintiff with an indelible pencil borrowed from Welton and returned to him immediately at the same time that the paper was delivered over to him. Welton claimed that he had discovered the mistake in numbering the section 32 instead of 33 while the paper was being written, and had called plaintiff's attention to the mistake and plaintiff himself had made the change. This was contradicted, but found to have occurred by the court. The defendants were in 1905 unable to substitute the N. W. $\frac{1}{4}$ of section 33, for the reason that they had sold it to a third person, and insisted that the contract had really been for the N. E. $\frac{1}{4}$ of section 33. Plaintiff offered to return the contract and demanded rescission and the repayment to him of the moneys which he had paid, which being refused he brought this action to accomplish that purpose. The court found that plaintiff and Welton did agree upon the sale and purchase of the N. E. $\frac{1}{4}$ of section 33 and that the duplicate of the land contract held by the defendants correctly expressed their agreement, and thereafter entered judgment

denying the relief prayed for by the plaintiff, from which judgment plaintiff appeals.

For the appellant there was a brief by *Masters, Graves & Masters,* and oral argument by *R. B. Graves.*

For the respondents there was a brief by *Olin & Butler,* and oral argument by *H. L. Butler.*

DODGE, J. We find difficulty in understanding the meaning of the trial court intended to be expressed by the findings, especially in view of the evidence. By finding 2 it is declared that on July 9th plaintiff agreed with Welton "to purchase one quarter of said section 33" at terms as to price and credits carefully specified. It is undisputed that all these terms were agreed upon before commencing the draft of the contract. Welton himself so testifies unambiguously, so we assume that finding relates to a time prior to the writing. Then findings 3 and 4 describe the clerical process by which the written contract was prepared in duplicate; and then comes finding 5, upon which alone can the judgment rest. It is as follows:

"That plaintiff talked of purchasing the N. W. $\frac{1}{4}$ of section 33 in said township 146, but that no contract of sale was entered into or agreement made until the writings above mentioned were executed, at which time plaintiff agreed to buy the N. E. $\frac{1}{4}$ of section 33."

Either this means that until the signing of the paper the minds of the parties never in fact met on the question which of the four quarters of section 33 plaintiff wished and had decided to purchase, or that, as mixed matter of law and fact, their transactions prior to that moment had not reached the stage of legal contract or agreement. In deference to our confidence in the legal learning of the trial judge, we should assume the former meaning but for the consideration that all the evidence, including the testimony of Welton, shows clearly that before bringing forth the contract blanks to be

filled he had full understanding from plaintiff or the third party, Rhodes, which quarter-section was selected and agreed to be purchased, and undertook to dictate the description of that quarter to the two scriveners. He says:

"At the hotel they said they would take the quarter, and they gave me the description of the quarter they wanted. . . . I simply gave it to him [in dictating] as I remembered he had given it to me."

Indeed, respondents' counsel frankly concedes that such understanding had been reached, although he contends against any conclusion that the N. W. $\frac{1}{4}$ was the one agreed on. We therefore must conclude that the trial court did not intend to find that a meeting of the minds of the parties had not in fact been reached before the writing. If the minds of the parties had met on the sale and purchase of a particular parcel of land and they signed a writing which both supposed described that parcel, but which, by clerical error, described some other, a case is presented for a court of equity to ascertain the true agreement and interpose to prevent the writing, as far as variant, being enforced as the contract of the parties, in absence of negligence or acquiescence. *Hurd v. Hall,* 12 Wis. 112; *Maldaner v. Beurhaus,* 108 Wis. 25, 33, 84 N. W. 25; *Kammermeyer v. Hilz,* 116 Wis. 313, 92. N. W. 1107; *Rowell v. Smith,* 123 Wis. 510, 102 N. W. 1; *Scheuer v. Chloupek,* 130 Wis. 72, 109 N. W. 1035; 2 Pom. Eq. Jur. (3d ed.) §§ 853, 859, 869, 870; 4 Pom. Eq. Jur. (3d ed.) § 1377. There is no question or dispute upon the evidence that both parties did suppose the writing contained a correct description of the quarter-section previously agreed on. Welton says he attempted to dictate the proper description thereof. Both plaintiff and Rhodes say they wrote mechanically the words which Welton dictated, supposing, of course, that they expressed the correct description.

We thus are brought to consider what was the parcel of land on which the minds of the parties came together before

preparing the writing, in which we are neither aided nor impeded by any finding of the trial court, since finding 5, to the effect that they did not agree on any, cannot be sustained as a finding of fact. The proof is overwhelming that after a considerable party of contemplative purchasers, including the plaintiff, and guided by Welton, had gone over a number of tracts to the southward, in which there is no evidence that plaintiff evinced any special interest, they came to section 32, town 146 N., range 93 W., which was government land and open to homestead entry. This section seems to have attracted several of the party. The plaintiff especially became much interested in the N. E. ¼ thereof. Defendants owned the whole of section 33, on the east of 32, and while Welton seems to have been guiding and counseling the party in their inspection of opportunities to enter homestead lands, he was specially interested in selling lands of the defendants, of which there were many thousand acres. He recommended plaintiff's approval of the N. E. of 32 as a homestead entry, and together they spent much time in locating the east line and northeast corner of that land. Thereupon plaintiff expressed an inclination, in case he made that entry, to purchase the adjoining quarter of section 33 belonging to defendants, and, with Welton, went over enough of it to enable a view of the whole. He then declared his decision that, if he took any land, he would homestead the N. E. ¼ of 32 and buy the adjoining quarter of 33, which of course was the N. W. This decision was stated in the presence of Welton, who commended it. This he substantially concedes, after somewhat evasively pleading imperfect memory of details, but it is also clearly established by testimony of plaintiff and many other members of the party. Plaintiff gave no attention to any other of the subdivisions of section 33. Welton testifies, somewhat vaguely, to plaintiff's attention being called to the S. E. ¼ of section 28, government land, and to the advisability of securing that and buying the N. E. of 33, which

adjoins it. This, however, is connected with a story of a trip to the northeast corner of section 33. Plaintiff denies it entirely and categorically, and a number of the party testify to the physical impossibility of any such trip by plaintiff and Welton as that in which the latter asserts such conversation occurred. Welton is clearly contradicted by the great weight of evidence, which confirms plaintiff in his testimony that he never looked at or knowingly saw the N. E. ¼ of 33, though the party may, in returning, have driven across the southwest corner of it. The following day several of the same party, still including Welton and plaintiff, returned to the railway station and to Dickinson, where was a land officer, went to the proper office, and there plaintiff, with the aid of Welton, entered the N. E. ¼ of 32 and paid the necessary fees. They then returned to the hotel, had supper, and Welton then said they better draw up the contracts, and got out some blanks. All agree that somewhere in the course of these events either plaintiff or Rhodes in his presence declared his acceptance of Welton's offer to sell some quarter of section 33. Probably such declaration was made more than once, for clearly Welton had been informed before going to the land office that plaintiff had decided to take up land, and the entry and purchase were obviously both involved in the same decision. The witnesses, with one exception, are indefinite in their statement of the exact words used, most of them merely declaring that plaintiff said he would take "the land" or "the quarter," and neither affirm nor deny that the words "northwest quarter" were spoken. The proof is definite and undisputed, however, that at no time was expressed any purpose or decision to take the N. E. ¼ of 33. One witness, Henry, does, however, testify that between the land office and the supper table he heard plaintiff tell Welton he would take the N. W. of 33, and of this there is no denial, except by inference from Welton's statement that he dictated to the scriveners the description which plaintiff had

given him, as he remembered it. That he dictated correctly the description on which they agreed is of course refuted by the unquestionable fact that he dictated "N. E. of 32," which plaintiff had already entered and which defendants did not own. In presence of this array of evidence we cannot escape the conviction that the agreement was for purchase and sale of the N. W. ¼ of section 33.

This being settled, the clerical error and mutuality of the mistake by which the description of another parcel got into the written contract is, as we have said, obvious, and is entirely conceivable when we remember that all three parties had in mind two known quarters of land together making up the tract or farm which plaintiff was attempting to secure. Merely the description of the wrong one of those two quarters unconsciously slipped from the tongue of Welton and was transferred to writing by the two scriveners, mechanically, neither of them going through the mental operation of translating the words into a mental picture of the parcel itself,— not a surprising event when we appreciate the symbolic and somewhat arbitrary use of government subdivisions. Nor is it at all made to appear that this, the real mistake, was discovered before execution and delivery of the papers, even if we accept Welton's version of the manner in which the number of the section became changed from 32 to 33 in the duplicate received and retained by him. He does not pretend that he noticed at all what subdivision of either section was written, but merely the number of the section, which being an even number and, therefore, owned by the United States, of course attracted his attention and he caused that to be changed without observing the other portion of the mistake in dictation, of which he was of course unconscious, if honest. We are convinced that the writings signed, whichever duplicate of the land contract be deemed the binding one, declares plaintiff to have purchased that which he never agreed to by such a mistake as to enable a court of equity to look back of the writing to the real agreement, under the

authorities above cited. Doubtless the first and most natural method of relief would be to reform the writing so as to truly express the contract and then enforce it. That is what plaintiff first requested of defendants, but they have declared and shown that, without fault on their part and before the discovery of the mistake, they have parted with the land which plaintiff bought and cannot specifically perform the real contract; hence the alternative of merely relieving the parties from an apparent contract they never made without attempting to enforce that which they did make either by specific performance or award of damages is at least as favorable to the defendants as they could demand, although, in view of their innocence of any intent to break their contract, we deem it as far as a court of equity ought to go.

We are unable to find laches on plaintiff's part to bind him, on the theory of ratification, to this written expression of a contract which he never made. One duplicate of the contract was sent him some weeks after it was executed. There was nothing to suggest need of re-examination, except as he had occasion to act thereunder as to payments. Besides this, no amount of inspection of the duplicate in his possession would have suggested any possibility of defendants' present claim that a parcel of their land, other than that which he intended to purchase, had been sold him, for his paper contained as description "northeast of 32," which defendants did not own, so that they must of course either consent to correction or return plaintiff's money. By retaining in their custody the paper on which they now claim, they of course prevented any inspection by plaintiff to discover the mistake therein. The evidence is direct and credible that he appealed to defendants for correction as soon as he in fact learned of the mistake.

*By the Court.*—Judgment reversed, and cause remanded with directions to render judgment canceling the written contracts described in the complaint, and awarding plaintiff judgment against the defendants *Robe Dow* and *George Dow*

for $403.70, with interest from June 5, 1905; also canceling and requiring surrender of the unpaid promissory notes given to evidence the postponed instalments of purchase price.